T.C. Memo. 2007-42

UNITED STATES TAX COURT


MYRON R. STRUCK AND THELMA C. STRUCK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7900-05.                    Filed February 22, 2007.


<u>David S. Greenberg</u>, for petitioners.

<u>Joseph P. Wilson</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined deficiencies in and
penalties on petitioners' Federal income taxes as follows:

| Year | Deficiency | Sec. 6662 Penalty |
|------|------------|-------------------|
| 2001 | $27,555 | $5,511 |
| 2002 | 6,790 | 1,358 |

After concessions by the parties, the primary issue for decision is whether petitioners qualify for the foreign earned income exclusion of section 911 (hereinafter sometimes "exclusion") under the two conjunctive requirements thereof.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 2001 and 2002, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

This case was tried on April 27, 2006, in San Diego, California. Some of the facts have been stipulated and are so found.

At the time the petition was filed, Myron and Thelma Struck resided in San Diego, California.

For approximately 27 years, from 1975 through early May 2002, Myron was employed full time as a yacht captain for owners of private yachts. Thelma also was employed on the yachts as a chef and stewardess.

Beginning in 1991 through May of 2002, Myron and Thelma were employed on a yacht that was owned by Cush Automotive, a California company, and that was operated primarily in foreign territorial waters. Each year, Cush Automotive paid Myron and Thelma a salary, their living expenses while on the yacht, and their vacation travel expenses back to the United States.

When underway, every 4 hours Myron would note in a log the yacht's longitude and latitude coordinates.

Except for approximately 2 weeks when on vacation in the United States, and even when docked in foreign ports, Myron and Thelma lived on the yacht.

Based on testimony and exhibits in evidence, including a review of the log coordinates that was performed by personnel of the U.S. Navy for purposes of this case, the charts below set forth (for Myron and Thelma's taxable years 2001 and 2002) our findings as to the number of days during the applicable 12-month periods on which Myron and Thelma were not physically present in foreign territorial waters and the number of days they were physically present in foreign territorial waters.[1]

As indicated in the charts, the two 12-month applicable periods we utilize to establish petitioners' 330 or more days of foreign physical presence requisite to qualify Myron and Thelma for the foreign earned income exclusion for 2001 and 2002 overlap each other and do not correspond to calendar years.

---

[1]We refer to each period of 12 consecutive months used in the calculation of a taxpayer's foreign earned income exclusion as an "applicable period".

For 2001
Applicable Period of January 7, 2001, to January 6, 2002

|  | Number of Days | |
| --- | --- | --- |
| Dates | Nonforeign Days | Foreign Days |
| 1/7/01 - 1/13/01 | 7 | |
| 1/14/01 - 1/26/01 | | 13 |
| 1/27/01 - 2/2/01 | 7 | |
| 2/3/01 - 2/7/01 | | 5 |
| 2/8/01 - 2/9/01 | 2 | |
| 2/10/01 - 8/20/01 | | 192 |
| 8/21/01 - 8/23/01 | 3 | |
| 8/24/01 - 12/19/01 | | 118 |
| 12/20/01 - 1/4/02 | 16 | |
| 1/5/02 - 1/6/02 | | 2 |
| Total | 35 | 330 |

For 2002
Applicable Period of May 16, 2001, to May 15, 2002

|  | Number of Days | |
| --- | --- | --- |
| Dates | Nonforeign Days | Foreign Days |
| 5/16/01 - 8/20/01 | | 97 |
| 8/21/01 - 8/23/01 | 3 | |
| 8/24/01 - 12/19/01 | | 118 |
| 12/20/01 - 1/4/02 | 16 | |
| 1/5/02 - 3/31/02 | | 86 |
| 4/1/02 - 4/3/02 | 3 | |
| 4/4/02 - 5/5/02 | | 32 |
| 5/6/02 - 5/15/02 | 10 | |
| Total | 32 | 333 |

On December 20, 2001, Myron and Thelma left the yacht in Costa Rica and flew to the United States for their annual 2-week vacation.  On January 4, 2002, Myron and Thelma returned to the yacht in Costa Rica.

On May 6, 2002, Myron and Thelma docked the yacht in the harbor in San Diego, California, and retired from working on yachts.

From 1986 through 2002, Myron and Thelma owned unimproved real property in Julian, California, and occasionally they camped on this unimproved real property.  During 2001 and 2002, Myron and Thelma were listed on the San Diego, California, county tax rolls as absentee owners of this unimproved real property.

From 1993 through 2002, Myron and Thelma also owned a townhouse in Coronado, California (townhouse), and they apparently claimed a California property tax homeowners' exemption relating to the townhouse.[2]  During all of 2001 and the first half of 2002, Myron and Thelma rented out the townhouse to tenants, and the townhouse was managed by real estate professionals.  Because it was rented out, Myron and Thelma did not stay in their townhouse while vacationing in California in 2001 and the first half of 2002.

---

[2]Cal. Const. art. 13, sec. 3(k), exempts $7,000 of a home's taxable value from California property tax assessment when the home constitutes the owner's principal residence and is occupied by the owner.

During 2001 and the first half of 2002, in California Myron and Thelma also maintained bank accounts, registered and garaged two vehicles at a relative's property, and maintained their driver's licenses.

Myron and Thelma's combined salaries from their employment on the yacht totaled $82,768 for 2001 and $71,063 for 2002.

On petitioners' 2001 joint Federal income tax return, petitioners reported their total $82,768 in salaries, and they claimed the foreign earned income exclusion with regard to that total amount. With the filing of their 2001 joint Federal income tax return, petitioners included a Form 2555-EZ, Foreign Earned Income Exclusion, relating to each petitioner. On these Forms 2555-EZ, petitioners entered the address of a relative in California in the blanks for "foreign address" and indicated an applicable period of January 1 to November 30, 2001.

On petitioners' 2002 joint Federal income tax return, petitioners reported their total $71,063 in salaries, and they claimed the foreign earned income exclusion with regard to $55,120 thereof (based on the number of days in petitioners' 2002 applicable period that fell within petitioners' 2002 taxable year).

With the filing of their 2002 joint Federal income tax return, petitioners included a Form 2555-EZ relating to each petitioner. On these Forms 2555-EZ, petitioners entered the

address of a relative in California in the blanks for "foreign address" and indicated an applicable period of January 1 to May 15, 2002.[3]

During respondent's audit, petitioners filed with respondent amended Forms 2555-EZ for 2001 and 2002 indicating a Costa Rica foreign address for both years and new applicable periods of November 30, 2000, to November 30, 2001, and May 16, 2001, to May 15, 2002, respectively, and petitioners cooperated with all of respondent's documented requests for information and otherwise cooperated with respondent.

Respondent's revenue agent concluded that petitioners did not have a foreign tax home for 2001 and 2002, and the revenue agent disallowed the total foreign earned income exclusions petitioners claimed for each year.

In their briefs, for purposes of calculating their foreign earned income exclusions for 2001 and 2002, petitioners request revised applicable periods for 2001 and 2002 respectively of January 1 to December 31, 2001, and May 6, 2001, to May 5, 2002. Alternatively, for each year, petitioners request that we apply whatever applicable periods would maximize petitioners' foreign earned income exclusions.

---

[3]The record does not explain why petitioners indicated on their filed Forms 2555-EZ, Foreign Earned Income Exclusion, for 2001 and 2002, respectively, applicable periods of only 11 months and 4-1/2 months.

In his briefs, respondent states that the only applicable periods we should consider for petitioners for 2001 and 2002 are January 1 to December 31, 2001, and May 16, 2001, to May 15, 2002.

OPINION

Taxpayers generally have the burden of proof. Rule 142(a). However, because petitioners submitted credible evidence, maintained records, and cooperated with respondent, the burden of proof regarding petitioners' physical presence during 2001 and 2002 is on respondent. Sec. 7491(a)(1), (2)(A) and (B).

Generally, section 911 provides to U.S. taxpayers a limited elective exclusion from gross income for income earned overseas.

To qualify for this foreign earned income exclusion for a particular year, a taxpayer: (1) Must have a foreign tax home, sec. 911(d)(1), and (2) must either be a bona fide resident of a foreign country for the taxpayer's full taxable year (bona fide residence requirement) or be physically present in a foreign country or countries for at least 330 days during any consecutive 12 months which overlap the taxpayer's taxable year (physical presence requirement), sec. 911(d)(1)(A) and (B).

A qualified taxpayer may only exclude the lesser of actual foreign earned income or the maximum amount set by statute. Sec. 911(b)(2)(A). Married taxpayers may each use their exclusions separately on separate returns or combine their exclusions on a joint return, sec. 1.911-5(a)(2), Income Tax Regs., and without

regard to community property laws, sec. 1.911-5(b), Income Tax Regs.

For 2001 and 2002, the maximum exclusions for a married couple filing a joint Federal income tax return totaled $156,000 and $160,000, respectively.  Sec. 911(b)(2)(D).

Foreign Tax Home Requirement

The foreign tax home requirement of section 911(d)(1) is to be evaluated during the same applicable period used by a taxpayer for the bona fide residence or the physical presence requirement. Sec. 1.911-2(a) and (b), Income Tax Regs.

Section 911(d)(3), which defines "tax home" as applied to the exclusion, incorporates the travel business expense provision of section 162(a)(2), as follows:  "The term 'tax home' means, with respect to any * * * [taxpayer], such * * * [taxpayer's] home for purposes of section 162(a)(2) (relating to traveling expenses while away from home)."  Thus, under the foreign earned income exclusion, the location of a tax home generally is determined in the same manner as the location of a tax home under section 162(a)(2).

In section 1.911-2(b), Income Tax Regs., it is explained that the location of a taxpayer's regular or principal place of business, or, if none, of a taxpayer's abode in a real and substantial sense, will be regarded as the location of a

taxpayer's tax home.  Section 1.911-2(b), Income Tax Regs.,

provides as follows:

> (b) * * * the term "tax home" has the same meaning which it has for purposes of section 162(a)(2) (relating to travel expenses away from home).  Thus, under section 911, * * * [a taxpayer's] tax home is considered to be located at his regular or principal (if more than one regular) place of business or, if the * * * [taxpayer] has no regular or principal place of business because of the nature of the business, then at his regular place of abode in a real and substantial sense. * * *

If in a year a taxpayer has neither a regular or principal

place of business nor any abode in a real and substantial sense,

a taxpayer may be classified as an itinerant whose tax home is

located wherever the taxpayer is physically located from day to

day.  Deamer v. Commissioner, 752 F.2d 337, 339 (8th Cir. 1985),

affg. T.C. Memo. 1984-63; Hicks v. Commissioner, 47 T.C. 71, 73

(1966); Rev. Rul. 73-529, 1973-2 C.B. 37.

During 2001 and until May 5, 2002, petitioners' business

consisted principally of traveling in international and foreign

waters to foreign countries on the yacht of Cush Automotive.

Because petitioners had neither a regular or principal place of

business, nor a specific abode in a real and substantial sense

during the applicable periods, we conclude that petitioners were

itinerants, that petitioners had a foreign tax home during the

300 plus days they were physically present in a foreign country

during petitioners' applicable periods for 2001 and for 2002, and

that petitioners therefore had a foreign tax home for purposes of the claimed foreign earned income exclusion.[4]

The last sentence of section 911(d)(3) provides that a taxpayer who has an abode in the United States will not be treated as having a tax home in a foreign country. Neither section 911 nor the regulations thereunder define "abode".[5] Court cases that have done so involve taxpayers who have alternated long blocks of time working abroad with long blocks of time at home in the United States where their families lived. Because the taxpayers had domestic ties (such as family) in the United States and only transitory ties in the foreign country where the taxpayers worked, the taxpayers were held to have a U.S. abode. See Harrington v. Commissioner, 93 T.C. 297, 307-309 (1989); Doyle v. Commissioner, T.C. Memo. 1989-463; Lemay v. Commissioner, T.C. Memo. 1987-256, affd. 837 F.2d 681 (5th Cir. 1988); Bujol v. Commissioner, T.C. Memo. 1987-230, affd. without published opinion 842 F.2d 328 (5th Cir. 1988). But cf. Jones v.

---

[4]Respondent herein does not argue that, as itinerants, petitioners had no foreign tax home for purposes of the sec. 911 foreign earned income exclusion. See, e.g., Henderson v. Commissioner, T.C. Memo. 1995-559 (holding that, for purposes of sec. 162(a)(2), an itinerant taxpayer may be treated as having no tax home and therefore may not be allowed "away from home" business travel expense deductions), affd. 143 F.3d 497, 499-501 (9th Cir. 1998).

[5]Sec. 1.911-2(b), Income Tax Regs., contains the following statement: "Maintenance of a dwelling in the United States * * * does not necessarily mean that the * * * [taxpayer's] abode is in the United States."

Commissioner, 927 F.2d 849, 856-857 (5th Cir. 1991), revg. T.C. Memo. 1989-616.

Because petitioners' townhouse was leased to others, not available to petitioners, and because petitioners had limited other ties to the United States, petitioners did not have an abode in the United States during petitioners' 2001 and 2002 applicable periods.

Physical Presence Requirement

Under the second requirement of section 911(d)(1), because petitioners acknowledge that they do not qualify for the foreign earned income exclusion under the bona fide foreign residence requirement, we address only the alternate physical presence requirement.

Under section 911(d)(1)(B), a taxpayer who spends at least 330 days during an applicable period in a foreign country or countries will satisfy the physical presence requirement for the related tax year.  For this purpose, a taxpayer is to add together all foreign days falling within any one applicable period.  Sec. 1.911-2(d)(1) and (2), Income Tax Regs.

An applicable period consists of any 12 consecutive months. Sec. 1.911-2(d)(1), Income Tax Regs.  In order for the exclusion to be applicable to reduce gross income in a particular year, the applicable period must have some overlap with the taxpayer's taxable year in question.  Sec. 1.911-3(d)(2) and (3), Income Tax

Regs. For a particular taxable year of a taxpayer, there may be a number of different applicable periods. See sec. 1.911-2(a)(2)(ii), (d), Income Tax Regs., and the examples thereunder.

A taxpayer may use whichever applicable period maximizes the foreign earned income exclusion. See sec. 911(d)(1)(B); sec. 1.911-2(a)(2)(ii), Income Tax Regs.[6]

Under section 911, a foreign country includes airspace, lands, and territorial waters under the sovereignty of a country, territory, or possession other than the United States. Farrell v. United States, 313 F.3d 1214, 1216 (9th Cir. 2002); Arnett v. Commissioner, 126 T.C. 89, 93-95 (2006), affd. 473 F.3d 790 (7th Cir. 2007); sec. 1.911-2(g) and (h), Income Tax Regs.

Because international waters are not under the sovereignty of any one country, time spent in international waters generally does not apply toward the 330 foreign day requirement. See Plaisance v. United States, 433 F. Supp. 936, 939 (E.D. La. 1977).

Although section 911(d)(1)(B) states that an aggregate of 330 full days of physical presence in a foreign country or countries is required, the regulations thereunder define a "full

---

[6]Respondent's Audit Technique Guide for Foreign Athletes and Entertainers (October, 1994) suggests that respondent's revenue agents may use a more favorable applicable period than the taxpayer initially indicated on a filed Form 2555, Foreign Earned Income. 4 Audit, Internal Revenue Manual (CCH), par. 204,601, at 23,046.

day" to include partial days of travel in or on international airspace, land, or waters from one foreign location to another foreign location. Therefore, a day involving travel in international waters between foreign locations in increments of less than 24 hours is treated as a full day in a foreign country. Sec. 1.911-2(d)(2) and (3), Income Tax Regs.

If the second alternate requirement of section 911(d)(1) is relied on (330 days of foreign physical presence) and if the applicable period selected by a taxpayer to satisfy the 330 days of foreign physical presence does not correspond to the taxpayer's taxable year, the taxpayer may only exclude the lesser of actual foreign income earned during the taxable year or a pro rata portion of the maximum exclusion amount that corresponds to the number of days of the applicable period that falls within the taxpayer's taxable year. Sec. 1.911-3(d)(2) and (3), Income Tax Regs.

Because we have found that petitioners were physically present in foreign countries for 330 days for 2001 (using an applicable period of January 7, 2001, to January 6, 2002[7]), and

---

[7]For 2001, petitioners have not specifically requested an applicable period of Jan. 7, 2001, to Jan. 6, 2002. However, petitioners have requested that the Court determine the applicable period that will maximize petitioners' exclusion. We agree with petitioners that generally we are not precluded from identifying and utilizing an applicable period that allows a taxpayer the maximum foreign earned income exclusion under the physical presence requirement.

for 333 days for 2002 (using an applicable period of May 16, 2001, to May 15, 2002), petitioners pass the foreign physical presence requirement for both years.

We explain further two of the disputes the parties have in calculating petitioners' foreign physical presence.

Respondent treats each day that involved a partial day of travel for petitioners in international waters as a nonforeign day.  As explained, however, section 1.911-2(d)(2) and (3), Income Tax Regs., provides that a partial day of travel in international waters in traveling from one foreign country to another foreign country be treated as a full foreign day.

Respondent argues that Myron's testimony does not establish petitioners' presence in Costa Rica from December 1 to December 19, 2001, and respondent asserts that those 19 days should not count as foreign days for petitioners.

We find Myron's testimony to be credible.  Furthermore, Myron's testimony was corroborated.  The yacht was docked in Costa Rica for the entire month of December 2001, and Myron's testimony regarding petitioners' travel to the United States in December 2001 was consistent with Myron's testimony that his vacation each year in the United States lasted only 2 weeks.

Respondent argues that petitioners' initial Forms 2555-EZ indicate that petitioners were located in the United States for the entire month of December 2001.  We disagree.  Petitioners'

Forms 2555-EZ for 2001 were silent as to December 2001, and petitioners made mistakes designating applicable periods on the Forms 2555-EZ that they initially filed for both 2001 and 2002.

Also, because of the shift to respondent of the burden of proof, respondent bears the burden to prove that petitioners were not in a foreign country for the first 19 days of December 2001.

Respondent argues further that for 2001 there are insufficient facts in evidence to evaluate the requirements of the foreign earned income exclusion under any applicable period other than January 1 to December 31, 2001.

We disagree. Petitioners' log, Myron's testimony, and the Navy review of the log establish petitioners' presence in foreign countries for the applicable period we utilize for 2001 -- namely January 7, 2001, to January 6, 2002, as well as for 2002.

Respondent also makes a procedural argument as to why we should analyze petitioners' qualifications for the exclusion only under the applicable periods petitioners indicated on their initially filed Forms 2555-EZ. Respondent argues that our utilization of a different applicable period for 2001 to measure petitioners' foreign physical presence constitutes a new issue not raised by the pleadings.

Although we have adjusted petitioners' applicable period for 2001, the issue remains what it has always been: Do petitioners

qualify for the exclusion?  Our slight adjustment in the applicable period for 2001 does not constitute a new issue.

Respondent argues that adjusting the applicable period at this point in the litigation would be unfair where respondent prepared for trial based on an applicable period of January 1 to December 31, 2001.

However, in respondent's pretrial memorandum and posttrial briefs, respondent acknowledges:  (1) That we might consider other applicable periods, (2) that an applicable period may be adjusted before examination, during examination, and during litigation, and (3) that we may make a finding as to the appropriate and most favorable applicable period.  In respondent's pretrial memorandum, respondent states as follows: "During 2001 and 2002, petitioners were not physically present in a foreign country for at least 330 full days, <u>nor any other period of 12 months in a row starting or ending in 2001 and 2002</u>."  (Emphasis added.)  Furthermore, respondent has had ample opportunity to brief the Court and to review the evidence.

On the facts of this case, we do not believe that the applicable period we use for petitioners for 2001 constitutes unfair surprise to respondent.  See <u>Estate of Keeton v. Commissioner</u>, T.C. Memo. 2006-263.

The parties' stipulation does not require a contrary result. The parties' stipulation only encompasses admissibility, not correctness, of the exhibits admitted into evidence.

Petitioners have established that they qualify for the exclusion for both 2001 and 2002: (1) Petitioners had a foreign tax home during the applicable periods, and (2) petitioners were physically present in foreign countries for at least 330 days of the applicable periods overlapping 2001 and 2002.

In light of our resolution of the foreign earned income issue in favor of petitioners, the section 6662 penalties determined by respondent are moot.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.[8]

---

[8]Because the applicable periods utilized in our opinion do not correspond to petitioners' taxable years, a pro rata adjustment to petitioners' exclusions for foreign earned income for 2001 and 2002 will need to be made under sec. 1.911-3(d), Income Tax Regs.