T.C. Memo. 2017-180

UNITED STATES TAX COURT

JESSE A. LINDE AND DAWN LINDE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1532-15.                    Filed September 18, 2017.

<u>George David Johnston</u> and <u>Paul F. Turner, Jr.</u>, for petitioners.

<u>Edwin B. Cleverdon</u> and <u>Horace Crump</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined deficiencies and section

6662(a)[1] accuracy-related penalties against petitioners in the following amounts:

_____

[1] Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect for the years in issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure.  We round all monetary amounts to

(continued...)

[*2]

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2010 | $10,092 | $2,018 |
| 2011 | 16,499 | 3,300 |
| 2012 | 16,477 | 3,295 |

The issues for decision are: (1) whether petitioner Jesse Linde is a "qualified individual" who is entitled to exclude portions of the wages that he earned overseas during the taxable years 2010, 2011, and 2012 (years in issue) under the foreign earned income exclusion provisions of section 911(a); (2) whether petitioners are entitled to deductions for unreimbursed employee business expenses claimed on Schedules A, Itemized Deductions, for the years in issue; and (3) whether petitioners are liable for accuracy-related penalties under section 6662(a).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. Petitioners reported Daleville, Alabama, as their mailing address on their petition.

_____

[1](...continued)
the nearest dollar.

[*3] I.     <u>Mr. Linde's Background</u>

Jesse and Dawn Linde are U.S. citizens. Mr. Linde grew up in Louisville, Kentucky, and joined the U.S. Army (Army) in 1972. In 1982 Mr. Linde was stationed in Fort Rucker, Alabama, where he trained to become a helicopter pilot. After retiring from the Army in 1992, Mr. Linde briefly worked for a car dealership and the Daleville, Alabama, police department.

In 1995 Mr. Linde resumed his piloting career in the private sector. From 1995 to 1997 he lived and worked in Saudi Arabia, where he trained helicopter pilots. He then obtained a similar job in Bosnia and worked there until 2000. Mr. Linde rejoined the Army after the September 11, 2001, terrorist attacks; he served initially as an instructor pilot at Fort Rucker in Alabama but was later deployed to the Sinai Peninsula. In 2005 Mr. Linde retired from the Army for a second time.

In 2009 Mr. Linde was offered a helicopter pilot job with Government contractor Blackwater Security Consulting (Blackwater) in Iraq. In his midfifties at the time, Mr. Linde was concerned about his employment prospects in the United States, which had an abundance of younger helicopter pilots. With each passing year Mr. Linde was becoming less marketable as a helicopter pilot in the United States. In Iraq Mr. Linde's age was not as great an obstacle so long as he could pass a physical. Petitioners discussed Mr. Linde's concerns and agreed that

[*4] he would accept the job offer and work in Iraq until he was willing and able to permanently retire. Mrs. Linde would remain in Alabama.

## II. Employment at DynCorp

Mr. Linde began working for Blackwater in April 2009. In November 2009 Blackwater lost its Government contract, and Mr. Linde became an employee of Blackwater's successor under the contract, DynCorp International, LLC (DynCorp). In connection therewith, Mr. Linde signed a one-year employment agreement with DynCorp. Thereafter the Iraqi Government issued Mr. Linde a residency visa. Throughout the years in issue and continuing through the date of trial Mr. Linde worked in Iraq as an employee of DynCorp pursuant to yearly employment agreements.[2]

Mr. Linde resided in Iraq for 248 days in 2010, 240 days in 2011, and 249 days in 2012. During these years Mr. Linde's primary responsibility was to fly "[a]ll over Iraq", transporting Government officials to various locations in direct support of the U.S. Ambassador to Iraq. In furtherance of this duty Mr. Linde communicated regularly with Iraqi intelligence personnel and several Iraqi

---

[2] All of DynCorp's contracts with its helicopter pilot employees are one-year agreements that are routinely renewed and reexecuted yearly. Mr. Linde expected that his contract would be renewed every year; as of 2016, his expectations were correct.

[*5] civilians. Because Mr. Linde was often subject to hostile fire, the U.S. Department of State issued him a firearm. Mr. Linde carried the firearm pursuant to a letter of authorization from the Iraqi Government. In 2012 Mr. Linde received a promotion and became responsible for overseeing the schedules of 36 other pilots in Iraq.

Mr. Linde's work schedule generally consisted of 60 straight days of 12-hour shifts followed by break periods of 30 days. Because DynCorp could not keep all of its employees in Iraq at one time, it required its helicopter pilots to leave Iraq every 60 days. Accordingly, DynCorp provided Mr. Linde a round-trip ticket to Kuwait at the conclusion of each 60-day period.[3] From there Mr. Linde flew to the United States at his own expense.[4] Because Mr. Linde's trips to and from the United States involved multiple flights, each round trip usually required three days of travel time. On some occasions Mr. Linde spent time in Europe before flying to the United States.

---

[3] At some point in 2012 DynCorp started providing round-trip tickets to Erbil, Iraq, rather than to Kuwait.

[4] DynCorp did not permit its employees, including Mr. Linde, to spend their break periods in Kuwait.

**[*6]** Mr. Linde spent the remainder of his break periods at his and Mrs. Linde's marital home in Daleville, Alabama.[5] While there, Mr. Linde spent time with Mrs. Linde and their two adult children, who also reside in Daleville. The special healthcare needs of petitioners' son-in-law, an Army veteran who was seriously injured while on active duty in Iraq, make overseas travel extremely difficult for Mrs. Linde and petitioners' children. Were it not for his son-in-law's disability, Mr. Linde would have arranged for Mrs. Linde and their children to join him in Europe for some of his break periods.

In Iraq Mr. Linde lived in a DynCorp-provided container housing unit (CHU), a large metal container comprising two bedrooms and a shared bathroom. No one else resided in Mr. Linde's bedroom when it was unoccupied, and he kept his personal belongings there while he was out of the country. For the first few months of 2010 Mr. Linde's CHU was in the Green Zone, an area of Baghdad with secured points of entry. Thereafter he moved to a CHU near the Baghdad airport, which was not in the Green Zone or an area otherwise declared secure.

When he was not working, Mr. Linde went on group excursions to local markets to purchase food and building materials, which he used for small

---

[5] Because of the dangerous conditions, DynCorp prohibited employees from bringing their relatives to Iraq.

**[*7]** construction projects to improve the conditions of his CHU.[6]  Mr. Linde also spent time dining in restaurants and socializing with several Iraqi interpreters whom he had befriended at work.

Since joining the Army in 1972, Mr. Linde has maintained an account at the Armed Forces Bank that he can use anywhere (including Iraq).[7]  From  February 2010 through May 2011 he also maintained an Iraqi bank account at the U.S. Embassy; he closed the account when the Iraqi bank stopped operating its branch there.  Meanwhile, Mr. Linde kept his vehicles in Alabama, where he was registered to vote and licensed to drive.

Mr. Linde did not pay taxes to the Iraqi Government during the years in issue.  However, in May 2013 DynCorp began withholding Iraqi income taxes from Mr. Linde's compensation.  That year DynCorp changed Mr. Linde's work

---

[6]  While Mr. Linde did not own a car in Iraq or have an Iraqi driver's license, he occasionally drove vehicles that the U.S. Department of State had provided to DynCorp.  Mr. Linde was allowed to use the vehicles for recreation so long as he was accompanied by another individual.

[7]  Petitioners stipulated that Mr. Linde had a bank account in Alabama. However, Mr. Linde clarified at trial that, while he could access his Armed Forces Bank account from Alabama, the account was not opened or maintained in Alabama.  Under Rule 91(e), the Court may relieve parties of a stipulation if justice so requires.  We will do so here because the stipulation is contrary to the record.  See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

**[\*8]** shifts from a 60-30 alternating schedule to a 90-30 one (i.e., 90 straight days of 12-hour shifts, with break periods of 30 days).

III.    Tax Return Preparation

Petitioners' returns for the years in issue were prepared by their longtime accountant, Bob Wills. Mr. Wills is an experienced accountant and tax return preparer in Dale County, Alabama, with a large number of clients who are helicopter pilots. For each year in issue petitioners provided Mr. Wills extensive information about Mr. Linde's work in Iraq and the expenses they sought to deduct. Mr. Wills advised petitioners that Mr. Linde was eligible for the foreign earned income exclusion for the years in issue. Mr. Wills also advised petitioners that certain expenses, including Mr. Linde's travel expenses, were deductible. Petitioners, who have no training in accounting or tax return preparation, believed that Mr. Wills' advice was reasonable.

On their returns petitioners excluded as foreign earned income $62,693 for 2010, $88,602 for 2011, and $88,716 for 2012. With respect to Mr. Linde's unreimbursed travel expenses, petitioners claimed deductions of $8,083, $9,312, and $9,875 for 2010, 2011, and 2012, respectively. Petitioners also claimed deductions of $244 and $160 for 2011 and 2012, respectively, pertaining to Mr. Linde's nontravel employee business expenses.

**[*9]** IV.     Notice of Deficiency

Respondent selected petitioners' returns for examination.  During the examination petitioners claimed they were entitled to deduct an additional $1,355 in nontravel employee business expenses for 2010.

On October 21, 2014, respondent sent petitioners a notice of deficiency for the years in issue.  In the notice respondent determined that petitioners were not eligible for the foreign earned income exclusion.  Respondent also disallowed the above-described deductions and determined that petitioners were liable for accuracy-related penalties under section 6662(a).[8]  Petitioners timely petitioned this Court, and a trial was held in Birmingham, Alabama.  We heard testimony from Mr. Linde, who had traveled from Iraq to the United States for the trial.  As of the date of trial, Mr. Linde was still employed by DynCorp in Iraq.

OPINION

I.     Burden of Proof

As a general rule, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S.

---

[8]  Other adjustments in the notice of deficiency are computational and need not be addressed.

**[*10]** 111, 115 (1933). Section 7491(a) shifts the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability for tax if the taxpayer meets certain preliminary conditions. See Higbee v. Commissioner, 116 T.C. 438, 442-443 (2001). Our conclusions here, however, are based on a preponderance of the evidence, and thus the allocation of the burden of proof is immaterial. See Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 210 n.16 (1998).

II.     Foreign Earned Income Exclusion

Section 61(a) provides that gross income means "all income from whatever source derived". Citizens of the United States are taxed on their worldwide income unless a specific exclusion applies. Specking v. Commissioner, 117 T.C. 95, 101-102 (2001), aff'd sub nom. Haessly v. Commissioner, 68 F. App'x 44 (9th Cir. 2003), and aff'd sub nom. Umbach v. Commissioner, 357 F.3d 1108 (10th Cir. 2003); Eram v. Commissioner, T.C. Memo. 2014-60, at *10. Exclusions from gross income are construed narrowly, and a taxpayer must clearly establish his entitlement to any such exclusion. Specking v. Commissioner, 117 T.C. at 101-102.

Section 911(a) provides that a "qualified individual" may elect to exclude from gross income, subject to limitations set forth in subsection (b)(2), his

**[*11]** "foreign earned income". To be entitled to this exclusion, a taxpayer must satisfy two distinct requirements. First, he must be an individual "whose tax home is in a foreign country". Sec. 911(d)(1). Second, he must be either a "bona fide resident" of one or more foreign countries for an uninterrupted period which includes an entire taxable year or physically present in such country or countries during at least 330 days in a 12-month period (physical presence test). Id.

As to the second requirement, petitioners have conceded that Mr. Linde does not satisfy the physical presence test. Consequently, petitioners must prove that during the years in issue: (i) Mr. Linde's tax home was in Iraq and (ii) Mr. Linde was a bona fide resident of Iraq.

A.     Foreign Tax Home

Section 911(d)(3) defines the term "tax home" as an individual's home for purposes of section 162(a)(2). Section 162(a)(2) provides for a deduction for ordinary and necessary expenses paid during the taxable year in carrying on a trade or business, including travel expenses incurred while away from home in the pursuit of a trade or business. See also Commissioner v. Flowers, 326 U.S. 465, 470-472 (1946). For purposes of section 162(a)(2) an individual's tax home is generally "the vicinity of the taxpayer's principal place of employment and not

**[*12]** where his or her personal residence is located." <u>Mitchell v. Commissioner</u>, 74 T.C. 578, 581 (1980); <u>see also</u> Rev. Rul. 75-432, 1975-2 C.B. 60.

An individual, however, shall not be treated as having a tax home in a foreign country for any period during which his abode is within the United States. Sec. 911(d)(3); <u>see also</u> <u>Harrington v. Commissioner</u>, 93 T.C. 297, 307 (1989). Temporary presence of the individual in the United States does not necessarily mean that the individual's abode is in the United States. Sec. 1.911-2(b), Income Tax Regs. Moreover, "[m]aintenance of a dwelling in the United States by an individual, whether or not that dwelling is used by the individual's spouse and dependents, does not necessarily mean that the individual's abode is in the United States." <u>Id.</u>

Mr. Linde's principal place of employment during the years in issue was in Iraq. Therefore, whether his tax home was in Iraq rests on whether his abode was in the United States during the years in issue. Neither section 911 nor the regulations thereunder define "abode". Thus we turn to our caselaw.

In prior section 911 cases, we have examined and contrasted a taxpayer's domestic ties (i.e., his familial, economic, and personal ties to the United States) with his ties to the foreign country in which he claims a tax home in order to determine whether his abode was in the United States during a particular period.

[*13] See Harrington v. Commissioner, 93 T.C. at 307-308; see also Eram v. Commissioner, T.C. Memo. 2014-60; Daly v. Commissioner, T.C. Memo. 2013-147; Struck v. Commissioner, T.C. Memo. 2007-42; Moudy v. Commissioner, T.C. Memo. 1989-216; Benham v. Commissioner, T.C. Memo. 1989-215; Bosarge v. Commissioner, T.C. Memo. 1989-15; Hummer v. Commissioner, T.C. Memo. 1988-528; Lemay v. Commissioner, T.C. Memo. 1987-256, aff'd, 837 F.2d 681 (5th Cir. 1988); Bujol v. Commissioner, T.C. Memo. 1987-230, aff'd without published opinion, 842 F.2d 328 (5th Cir. 1988). Even though a taxpayer may have some limited ties to a foreign country during a particular period, if the taxpayer's ties to the United States remain strong, we have held that his abode remained in the United States, especially when his ties to the foreign country were transitory or limited during that period. See Harrington v. Commissioner, 93 T.C. at 308.

On the basis of the record before us, we conclude that Mr. Linde had stronger ties to Iraq than he did to the United States during the years in issue. At all relevant times Mr. Linde's economic and social life was centered in Iraq. Mr. Linde credibly testified that, while it was becoming nearly impossible for him to work as a helicopter pilot in the United States, he could do so in Iraq for the

**[\*14]** foreseeable future.[9]  Mr. Linde did not work in any other country besides Iraq, and he spent two-thirds of each year in issue there.  Mr. Linde's economic ties to Iraq grew stronger over the years in issue.  He opened a bank account there in 2010, and in 2012 he accepted a promotion from DynCorp.  Moreover, Mr. Linde's use of his free time in Iraq--socializing with other contractors and Iraqi interpreters, making physical improvements to his CHU, and visiting local markets and restaurants--evidences an effort to create a domestic and personal life for himself there.

We encountered similar facts involving a pilot in Cobb v. Commissioner, T.C. Memo. 1991-376, 1991 Tax Ct. Memo LEXIS 420.  In Cobb, the taxpayer resided with his spouse and children in Alaska for several years before accepting a permanent transfer assignment in Japan.  Id., 1991 Tax Ct. Memo LEXIS 420, at \*3-\*4.  During the years at issue in that case the taxpayer lived in a Japanese hotel when he was not in transit; his family remained in the United States.  Id. at \*5, \*7.  While he did not participate extensively in Japanese cultural or social activities, he attended dinner parties with Japanese friends and was a member of the hotel's

---

[9] We find Mr. Linde to be honest, forthright, and credible.  See Diaz v. Commissioner, 58 T.C. 560, 564 (1972) (observing that the process of distilling truth from the testimony of witnesses, whose demeanor we observe and whose credibility we evaluate, is the daily grist of judicial life).

[*15] swim club.  Id. at *6.  During flight layovers in Los Angeles, the taxpayer stayed with his family in Redlands, California.[10]  Id. at *7, *19.  The taxpayer maintained a joint checking account with his wife in California.  Id. at *8.  His personal physician and dentist were also there.  Id. at *9.  After concluding that the Mr. Cobb had intended to become a resident of Japan, we held that he did not have an abode in the United States despite his U.S.-based family and "other substantial ties" to the United States.  See id. at *15, *18-*19.  While Mr. Cobb spent time in the United States with his family, such trips were "mere visits" and "limited by convenience and * * * [the taxpayer's] flight schedule".  Id. at *19.

Mr. Linde's ties to the United States were equal to those of Mr. Cobb.  Both took permanent work assignments in foreign countries while their families remained in the United States.  Like Mr. Cobb, Mr. Linde had limited opportunities to return to his family in the United States because of his work schedule and his employer's demands.

Meanwhile, Mr. Linde's ties to Iraq were stronger than Mr. Cobb's ties to Japan.  Mr. Linde exclusively occupied and even improved his living quarters, whereas Mr. Cobb lived in various hotel rooms.  While Mr. Cobb had little contact

---

[10]  After the taxpayer moved to Japan, his spouse and children moved to Redlands, California.  Cobb v. Commissioner, T.C. Memo. 1991-376, 1991 Tax Ct. Memo LEXIS 420, at *7.

**[\*16]** with the Japanese community, Mr. Linde had regular contact with Iraqi citizens at work and socialized with several Iraqi interpreters during his free time.[11]

In support of his contention that Mr. Linde had an abode in the United States, respondent relies on Bujol v. Commissioner, T.C. Memo. 1987-230, 1987 Tax Ct. Memo LEXIS 234, and Moudy v. Commissioner, T.C. Memo. 1989-216, 1989 Tax Ct. Memo LEXIS 216. Bujol v. Commissioner, 1987 Tax Ct. Memo LEXIS 234, at \*2, involved an oil rig worker whose rig was stationed off the coast of the United Arab Emirates (UAE). His schedule consisted of 28 work days, the entirety of which he spent on the rig, followed by a 28-day break period with his family in Louisiana. Id. at \*2-\*3. As a condition of employment, the taxpayer was required to maintain a residence in the United States. Id. at \*4. We held that the taxpayer's abode was in the United States because he had minimal contact with the UAE and strong economic, familial, and personal ties to Louisiana. Id. at \*9.

---

[11] In Jones v. Commissioner, 927 F.2d 849 (5th Cir. 1991), rev'g T.C. Memo. 1989-616, the Court of Appeals for the Fifth Circuit reviewed facts substantially similar to those in Cobb. Holding that an airline pilot (who was stationed in Japan) did not have an abode in the United States, the Court suggested that the purpose of the "abode" provision was to limit the benefits of the foreign earned income exclusion to taxpayers whose foreign employment resulted in increased expenses. See id. at 856. We believe that Mr. Linde, who paid substantial sums for his flights to and from Kuwait, fits into this category.

**[\*17]** In <u>Moudy v. Commissioner</u>, 1989 Tax Ct. Memo LEXIS 216, at \*4-\*5, the taxpayer worked as a drilling supervisor on an oil rig compound on the mainland of Nigeria with a 28-day alternating work schedule. During his work periods the taxpayer rarely left the compound. <u>Id.</u> at \*9. He returned to his family in the United States at some point during every rest period. <u>Id.</u> at \*7-\*8. After two years, the taxpayer returned to the United States permanently when his employer ceased operations in Nigeria. <u>Id.</u> at \*10. Holding that the taxpayer's abode was in the United States, we concluded that he had strong ties to the United States, where he visited his family frequently and owned property. <u>Id.</u> at \*17, \*21-\*22. Meanwhile, the taxpayer's ties to Nigeria were "merely transitory" because he remained "significantly isolated from the mainstream of Nigerian life" and "never had any long-term intention to stay in Nigeria as a resident." <u>Id.</u> at \*19, \*21.

Respondent also relies on <u>Daly v. Commissioner</u>, T.C. Memo. 2013-147, at \*3, which involved a Government contractor who had worked in both Afghanistan and Iraq. In <u>Daly</u> the taxpayer husband worked for a Utah-based company and expected each of his assignments in Afghanistan or Iraq to last approximately three months. <u>Id.</u> He spent no more than 106 days and 93 days in those countries during the two taxable years at issue. <u>Id.</u> at \*14. While deployed in Afghanistan and Iraq, he was not permitted to leave the U.S. military bases on which he lived

[*18] and worked.  Id. at *4.  The taxpayer husband also worked for his employer in Utah, California, and Nevada during the taxable years at issue.  Id.  Meanwhile the taxpayer wife remained in Utah.  Id. at *5.  On the basis of these facts, we found that the taxpayer husband's ties to Iraq and Afghanistan were "severely limited and transitory" during the relevant period, while his ties to Utah remained strong.  Id. at *12.  Consequently we held that, during the years at issue in that case, the taxpayer husband's abode was in the United States.  Id. at *13.

The facts in these cases are distinguishable from those at bar.  Unlike the taxpayers in Bujol, Moudy, and Daly, Mr. Linde accepted a job in Iraq with the express intention of remaining there indefinitely.  When they were overseas, the taxpayers in Bujol, Moudy, and Daly spent little (if any) time off the oil rig, compound, or secured base, respectively, whereas Mr. Linde lived outside the Green Zone in an unsecured area of Iraq, traversed the country in the course of his employment, and participated in Iraqi life to the extent possible.  The taxpayers in Bujol, Moudy, and Daly also returned to the United States more frequently than Mr. Linde, who spent approximately two-thirds of each year in issue in Iraq.

Respondent also contends that Mr. Linde's abode was in Alabama because he visited his family there and owned a home there.  Respondent cites Mr. Linde's Alabama driver's license and voter registration as additional evidence of his ties to

[*19] Alabama. However, Mr. Linde credibly testified about the lack of piloting opportunities in the United States, his desire to remain in Iraq indefinitely, and the effort he has made to create a domestic and personal life for himself there. We also credit Mr. Linde's testimony that he would have preferred to meet his family in Europe but could not do so because of his son-in-law's disability. In the light of this and other evidence, we find that Mr. Linde's ties to the United States were not as strong as respondent contends. Petitioners' ownership of a home in Alabama and Mr. Linde's occasional visits there do not compel a different conclusion. The regulations explicitly state that "[m]aintenance of a dwelling in the United States by an individual, whether or not that dwelling is used by the individual's spouse and dependents, does not necessarily mean that the individual's abode is in the United States." Sec. 1.911-2(b), Income Tax Regs. (emphasis added). Furthermore, temporary presence of the individual in the United States does not necessarily mean that the individual's abode is in the United States. Id.

Considering the unique facts and circumstances of this case, including Mr. Linde's continuous employment in Iraq up to the date of trial, we find that Mr. Linde's ties to Iraq were stronger than his ties to the United States during the years

[*20] in issue. We therefore hold that Mr. Linde's abode was not in the United States and that his tax home was in Iraq.

B.    Bona Fide Residence

Whether an individual is a bona fide resident of a foreign country is determined by applying, to the extent practical, the principles of section 871 and the regulations thereunder. Id. para. (c). Bona fide residence in a foreign country or countries for an uninterrupted period may be established, even if the taxpayer makes temporary visits during the period to the United States or elsewhere on vacation or business. Id.

As we have stated: "Bona fide residence is primarily a question of fact, and it is, therefore, difficult to reconcile the many cases in the area." Dawson v. Commissioner, 59 T.C. 264, 268 (1972). "Although the meaning may vary according to context, 'residence' generally requires both physical presence and an intention to remain." Martinez v. Bynum, 461 U.S. 321, 330 (1983).

In Sochurek v. Commissioner, 300 F.2d 34, 38 (7th Cir. 1962), rev'g 36 T.C. 131 (1961), the Court of Appeals for the Seventh Circuit enumerated the following factors as relevant in determining bona fide foreign residence: (1) intention of the taxpayer; (2) establishment of a home in the foreign country for an indefinite period; (3) participation in cultural and social activities;

**[\*21]** (4) physical presence in the foreign country; (5) nature, extent, and reasons for temporary absences from his temporary foreign home; (6) assumption of economic burdens and payment of taxes to the foreign country; (7) status of resident contrasted to that of transient or sojourner; (8) treatment accorded his income tax status by his employer; (9) marital status and residence of his family; (10) nature and duration of his employment; whether his assignment abroad could be promptly accomplished within a definite or specified time; and (11) good faith in making the trip abroad; whether for purpose of tax evasion. "While all such factors may not be present in every situation, those appropriate should be properly considered and weighed." Id. The taxpayer must meet a heavier-than-normal "strong proof" standard in order to carry his burden to prove bona fide residence under section 911. Schoneberger v. Commissioner, 74 T.C. 1016, 1024 (1980).

In Vento v. Dir. of V.I. Bureau of Internal Revenue, 715 F.3d 455, 467-468 (3d Cir. 2013), the Court of Appeals for the Third Circuit grouped the Sochurek factors into four broad categories: (1) the taxpayer's intent, (2) the taxpayer's physical presence, (3) the taxpayer's social, family, and professional relationships, and (4) the taxpayer's representations. The Court of Appeals for the Eleventh Circuit, to which an appeal in this case would lie (absent a stipulation to the contrary), adopted the Vento categories with the caveat "that those factors are not

**[\*22]** exclusive; rather, the appropriate analysis is one based on the totality of the circumstances relevant to the residency issue." See Commissioner v. Estate of Sanders, 834 F.3d 1269, 1280 (11th Cir. 2016), vacating and remanding 144 T.C. 63 (2015). Under Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), we are guided by Eleventh Circuit precedent in deciding this case.

"The intent to become a resident is not the intent to 'make a fixed and permanent home.' * * * Rather, it is the intent to 'remain indefinitely or at least for a substantial period' in the new location." Vento, 715 F.3d at 470. The establishment of a long-term home or a long-term employment assignment is evidence of such intent. Id. at 467. "A taxpayer's sustained physical presence in a place will support a finding of bona fide residency there." Id. Long absences will negate such a finding unless they are necessitated by good-faith reasons "such as the travel requirements of the taxpayer's profession." Id. In the Eleventh Circuit, "the taxpayer's time spent at an alleged place of residency is of particular importance, and * * * it is usually appropriate to compare time spent there with time spent in other places". Commissioner v. Estate of Sanders, 834 F.3d at 1280.

Having considered all the facts in this case in the light of the Sochurek factors and the Court of Appeals for the Eleventh Circuit's guidance, we hold that

[*23] petitioners have carried their burden to prove that Mr. Linde was a bona fide resident of Iraq during the years in issue. Mr. Linde credibly testified that he began working for DynCorp in Iraq with the intention of remaining there indefinitely. His actions during and after the years in issue confirm this stated intention, as does the fact that he was still employed in Iraq on the date of trial. Mr. Linde spent two-thirds of each year in issue in Iraq, and his absences from Iraq were at the behest of Dyncorp. Meanwhile, he spent one-third or less of each year in issue in the United States.

Respondent contends that Mr. Linde's employment in Iraq was not indefinite because it was governed by a series of one-year contracts. However, Mr. Linde's contract was routinely renewed and reexecuted yearly. During the relevant period Mr. Linde intended to stay in Iraq indefinitely with the expectation that his contract would continue to be extended. Mr. Linde's continued employment there after the years in issue confirms that his expectations were correct. Accordingly, we find that Mr. Linde's employment at DynCorp was for an indefinite duration.

Respondent also argues that Mr. Linde cannot be a bona fide resident of Iraq because he does not intend to remain there after he retires. However, the record contains no evidence that Mr. Linde intends to retire in the near future.

**[\*24]** Furthermore, respondent overstates the requirements of residency, which does not necessitate an intention to make a fixed and permanent home. See Vento, 715 F.3d at 470.

In sum, Mr. Linde's acceptance of a long-term assignment in Iraq and his sustained physical presence there weigh heavily in favor of bona fide residency, and we so hold. See Commissioner v. Estate of Sanders, 834 F.3d at 1280; Vento, 715 F.3d at 470. Accordingly, since we have already found that Mr. Linde's tax home was in Iraq during the years in issue, petitioners are entitled to the foreign earned income exclusions claimed on their returns.

III.    Unreimbursed Employee Business Expenses

We next determine whether petitioners are entitled to deductions for unreimbursed employee business expenses.

Deductions are a matter of legislative grace, and the taxpayer generally bears the burden of proving entitlement to any deduction claimed. See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). A taxpayer claiming a deduction on a Federal income tax return must demonstrate that the deduction is allowable pursuant to a statutory provision and must further substantiate that the expense to which the deduction relates has been paid or incurred. See sec. 6001; Hradesky v.

**[*25]** <u>Commissioner</u>, 65 T.C. 87, 89-90 (1975), <u>aff'd per curiam</u>, 540 F.2d 821 (5th Cir. 1976).

Section 162 allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred by the taxpayer in carrying on a trade or business; but personal, living, or family expenses are not deductible. Secs. 162(a), 262(a). A trade or business expense is ordinary if it is normal or customary within a particular trade, business, or industry, and it is necessary if it is appropriate and helpful for the development of the business. <u>Commissioner v. Heininger</u>, 320 U.S. 467, 471 (1943); <u>Welch v. Helvering</u>, 290 U.S. at 113-114. Whether an expenditure is ordinary and necessary is generally a question of fact. <u>Commissioner v. Heininger</u>, 320 U.S. at 475.

A "trade or business" includes the "trade or business" of being an employee. <u>O'Malley v. Commissioner</u>, 91 T.C. 352, 363-364 (1988); <u>Primuth v. Commissioner</u>, 54 T.C. 374, 377-378 (1970). The taxpayer bears the burden of establishing that his employer would not have reimbursed him for such expenses. <u>See</u> <u>Podems v. Commissioner</u>, 24 T.C. 21, 23 (1955); <u>Benson v. Commissioner</u>, T.C. Memo. 2007-113; <u>Putnam v. Commissioner</u>, T.C. Memo. 1998-285. He can do so by showing that he was required or expected to bear these costs. <u>See</u> <u>Fountain v. Commissioner</u>, 59 T.C. 696, 708 (1973); <u>see also</u> <u>Dunkelberger v.</u>

[*26] <u>Commissioner</u>, T.C. Memo. 1992-723 (finding that management team expected taxpayer to bear expense of business lunches with vendors).

A.    <u>Mr. Linde's Travel Expenses</u>

Petitioners argue that they are entitled to deduct the cost of Mr. Linde's flights to and from the United States.  For the reasons below we disagree.

Section 162(a)(2) includes within the ambit of section 162(a) traveling expenses while away from home in the pursuit of a trade or business.  Traveling expenses include lodging, meals, travel fares, and other expenses incident to travel.  Sec. 162(a)(2); sec. 1.162-2(a), Income Tax Regs.  To claim a traveling expense deduction, a taxpayer must show:  (1) that his expenses are ordinary and necessary; (2) that he was away from home when he incurred the expenses; and (3) that the expenses were incurred in pursuit of a trade or business.  <u>Commissioner v. Flowers</u>, 326 U.S. at 470.  "[I]n the pursuit of a trade or business" has been read to mean:  "The exigencies of business rather than the personal conveniences and necessities of the traveler must be the motivating factors."  <u>Id.</u> at 474.

Mr. Linde testified that DynCorp did not allow him to stay in Kuwait during his break periods and did not cover his remaining travel costs.  However, the record is insufficient to establish a business purpose for Mr. Linde's travel

[*27] between Kuwait and the United States.[12] We therefore hold that petitioners have not demonstrated their entitlement to deductions for Mr. Linde's travel expenses. Accordingly, we sustain respondent's determination as to these expenses.

B.     Mr. Linde's Nontravel Expenses

For 2010, 2011, and 2012 petitioners contend that they are entitled to deductions of $1,355, $244, and $160 respectively for nontravel employee business expenses. The record reflects that Mr. Linde incurred expenses for computer equipment, clothes, a flashlight, locks, headphones, a cordless telephone, books, a weapons permit, a medical examination, and a passport.

We first address petitioners' deductions for computer equipment. A taxpayer must satisfy the strict substantiation requirements of section 274(d) in order to deduct expenses attributable to listed property, including computers and computer-related peripheral equipment. Secs. 274(d)(4), 280F(d)(4)(A)(iv) and (v). Regulations specify that, with respect to listed property, the taxpayer must "substantiate" the following elements: (1) the cost of each individual item of listed property; (2) the amount of the business use and total use of the property;

_____

[12] At some point in 2012 DynCorp began flying Mr. Linde to Erbil, Iraq, rather than to Kuwait. The record is insufficient to establish a business purpose for Mr. Linde's travel to and from Erbil.

[*28] (3) the date of the expenditure or use with respect to listed property; and (4) the business purpose of the expenditure or use. Sec. 1.274-5T(b)(1), (6), Temporary Income Tax Regs., 50 Fed. Reg. 46014, 46016 (Nov. 6, 1985). Each element can be substantiated by either adequate records or sufficient evidence. See sec. 274(d).

Mr. Linde credibly testified that he purchased a computer in 2010 and used it in Iraq for business and personal purposes. He also credibly testified that DynCorp denied his request for reimbursement. However, the record contains no evidence specifying the amount of the business use of the computer relative to the total use of the computer. We therefore find petitioners' evidence inadequate in satisfying the second element above requiring evidence of business use relative to total use. See sec. 1.274-5T(b)(1), (6), Temporary Income Tax Regs., supra.

With respect to Mr. Linde's other expenses, petitioners failed to establish that they were not reimbursible. The record is devoid of any evidence that Mr. Linde sought reimbursement of these expenses from DynCorp. We therefore sustain respondent's disallowance of petitioners' deductions for Mr. Linde's nontravel employee business expenses.

**[\*29]** IV.   Accuracy-Related Penalties

We next determine whether petitioners are liable for accuracy-related penalties under section 6662(a).  Petitioners argue that they should not be liable for the penalties because they acted on the advice of their return preparer. Respondent argues that he met his burden of production with respect to the penalties and that petitioners have not established that they acted with reasonable cause in relying on their return preparer.

Section 6662(a) and (b)(2) provides that taxpayers will be liable for a penalty equal to 20% of the portion of an underpayment of tax attributable to a substantial understatement of income tax.  Section 6662(d)(1)(A) provides that an understatement of income tax is substantial if the amount of the understatement exceeds the greater of (1) 10% of the tax required to be shown on the return or (2) $5,000.  The Commissioner bears the initial burden of production.  Sec. 7491(c).  If the Commissioner satisfies his burden, the taxpayer then bears the ultimate burden of persuasion.  Higbee v. Commissioner, 116 T.C. at 446-447.

The accuracy-related penalty is not imposed with respect to any portion of the underpayment as to which the taxpayer shows that he acted with reasonable cause and good faith.  Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448. Generally, the most important factor is the extent of the taxpayer's effort to assess

[*30] his proper tax liability. Humphrey, Farrington & McClain, P.C. v. Commissioner, T.C. Memo. 2013-23; sec. 1.6664-4(b)(1), Income Tax Regs. Reliance upon the advice of a tax professional may establish reasonable cause and good faith for the purpose of avoiding liability for the section 6662(a) penalty. See United States v. Boyle, 469 U.S. 241, 250-251 (1985). Whether reasonable cause exists when a taxpayer has relied on a tax professional to prepare a return must be determined on the basis of all the facts and circumstances. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

This Court has stated that reasonable cause and good faith are present where the record establishes by a preponderance of the evidence that: (1) the taxpayer reasonably believes that the professional upon whom the reliance is placed is a competent tax adviser who has sufficient expertise to justify reliance; (2) the taxpayer provides necessary and accurate information to the adviser; and (3) the taxpayer actually relies in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99.

If the Rule 155 computations confirm substantial understatements for the years in issue, then respondent has met his burden of producing evidence that the

**[*31]** penalties are appropriate. <u>See</u> sec. 7491(c); <u>Higbee v. Commissioner</u>, 116 T.C. at 446-447.

Petitioners' tax returns for the years in issue were prepared by a competent tax professional. Petitioners made full disclosure to this professional of all relevant facts concerning Mr. Linde's employment in Iraq and his related expenses. The return preparer advised them that Mr. Linde's expenses were deductible. Although this advice was incorrect, petitioners do not have backgrounds in accounting or tax, and we are satisfied that they reasonably relied on the advice they were given. Accordingly, petitioners have carried their burden of proving that the accuracy-related penalties do not apply.

In reaching our conclusions, we have considered all arguments made by the parties and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.
